UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
Miami Division

Case Number: 15-20590-CR-MORENO

UNITED STATES OF AMERICA,

vs.

JEAN BAPTISTE JOSEPH,

       Defendant.

_____/

## ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS

Defendant, who had been identified by an accomplice in a homicide, moves to suppress items seized from his bedroom that he had been renting from the homeowner. The Court finds that there were exigent circumstances that justified the initial search and that Defendant consented to the second search. Therefore, Defendant's Motion to Suppress is **DENIED**.

### I.    BACKGROUND

Defendant Jean Baptiste Joseph was arrested on June 5, 2015, and was charged with being a felon in possession of a firearm, possession with intent to distribute ethylone and marijuana, and possession of a firearm in furtherance of a drug trafficking crime. At the time of his arrest—which took place in Joseph's bedroom—law enforcement seized physical evidence that was in plain view (the "First Search"). Law enforcement later completed a thorough search of Joseph's bedroom and uncovered additional physical evidence (the "Second Search").

Joseph seeks to suppress the physical evidence seized during both searches on the following grounds: (1) the First Search violated the Fourth Amendment because there were no exigent circumstances justifying law enforcement's warrantless entry into his bedroom; and (2)

the Second Search violated the Fourth Amendment because it was conducted without valid consent.

An evidentiary hearing was held prior to trial, at which time the Government called police detectives Miguel Suarez and Alex Barney of the Hialeah Police Department. Their testimony revealed that Joseph was a suspect in a homicide and armed robbery, which occurred on March 3, 2015. The firearm used in the crimes was not recovered. After identifying and arresting Joseph's co-conspirator in the homicide in April 2015, the police obtained from this co-conspirator various phone numbers used by Joseph. On June 4, 2015, Detective Suarez obtained a "track and trace" order—based on a probable cause finding made by a Florida State court judge—to pinpoint Joseph's location by using a recently-activated phone number. On June 5, 2015, the police tracked Joseph's phone to a home in Miami Gardens, Florida.

Police set up surveillance and monitored activity in the home for several hours. During that time, a vehicle pulled up, and a person went inside the home. Moments later, a male and female exited the home and drove away in the same vehicle. Detective Barney and his partner stopped the vehicle and questioned its occupants about whether Joseph was inside the house. The person driving the vehicle confirmed that Joseph was inside the house.

Shortly thereafter, four police officers, led by Detectives Suarez and Barney, approached the front of the home and knocked on the door. Detective Suarez, who was the first officer in the stack formation, carried a ballistic shield and weapon drawn to his side. When Detective Suarez knocked, Dewayne Murray, answered the door. Murray then moved outside the home and behind Detective Suarez to speak with Detective Barney. During that conversation, Murray stated that he was the owner of the home, confirmed that Joseph was in the home, identified the

room in which Joseph was located, and gave police consent to enter the home.[1] At this point in time, the door to the house was "completely open."

Detective Suarez testified that, while Murray spoke with Detective Barney, he saw Joseph in the hallway just inside the doorway on Detective Suarez's left. Detective Suarez testified that Joseph made eye contact with him and then immediately turned around and went back toward his bedroom. At that point, Detective Suarez entered the home and followed Joseph toward his bedroom. Joseph tried to close the door, but Detective Suarez put his foot in the door and entered the bedroom. Inside, he encountered Joseph and a female occupant. The other police officers, including Detective Barney, entered the bedroom after Detective Suarez. Police handcuffed Joseph and conducted a visual sweep. During this "First Search," the police discovered, in plain view, the following items: (1) a Draco 7.62 x 39 caliber rifle loaded with 30 rounds; (2) a high capacity drum loaded with 65 rounds of 7.62 x 39 ammunition; (3) Ziploc bags containing approximately one kilogram of ethylone; (4) a digital scale; (5) a Ziploc bag containing approximately 70 grams of marijuana; (6) a box with 70 rounds of 9 millimeter ammunition; (7) a high capacity magazine loaded with 29 rounds of 9 millimeter ammunition; and (8) Joseph's U.S. Passport, social security card, and Florida identification card. *See* U.S.'s Suppl. Resp. to Def.'s Mot. to Suppress at 1.

After Joseph was arrested, police transported him to the City of Hialeah police department. Detective Suarez testified that he and one Detective Carlos Garcia were present with Joseph when Joseph signed a "Hialeah Police Department Advice of Rights" form and a "Hialeah Police Department Consent to Search" form. *See* Gov't Exs. 5 & 6. Detective Suarez

---

[1]  Detective Barney testified that when he first spoke to Murray outside the house, Murray did not tell him that he was renting a room to Joseph or that Joseph was living in Murray's house. Detective Barney testified that Murray did not tell him that Joseph rented a room from him until "afterwards," i.e. after Joseph had been arrested.

3

also testified that approximately "[a]n hour or two hours" passed between Joseph's arrest and the time of his written consent, and that neither he nor Detective Garcia made any threats to Joseph before he signed either form. The "Advice of Rights" form states as follows:

> I HAVE READ THIS STATEMENT OF MY RIGHTS AND I UNDERSTAND WHAT MY RIGHTS ARE. I AM WILLING TO MAKE A STATEMENT AND ANSWER QUESTIONS. I DO NOT WANT A LAWYER AT THIS TIME. I UNDERSTAND AND KNOW WHAT I AM DOING. NO PROMISES OR THREATS HAVE BEEN MADE TO ME. NO PRESSURE OR COERCION OF ANY KIND HAS BEEN USED AGAINST ME.

Gov't Ex. 5. The "Consent to Search" form also explained that Joseph "may refuse to consent to a search and may demand that a search warrant be obtained prior to any search of [his bedroom]." Gov't Ex. 6. It also stated that if Joseph consented "to a search, anything of evidentiary value seized in the course of the search can and will be introduced into evidence against [him] in court." In signing the form, Joseph declared that he "was fully aware of his rights" and was "consent[ing] to a search [of his bedroom] without warrant by officers of the City of Hialeah Police Department." He further declared that the "statement [was] signed of [his] own free will without any threats or promises having been made to him."

After Joseph signed the "Consent to Search" form, police officers thoroughly searched his bedroom. During this "Second Search," the police discovered the following items: (1) an additional four bags containing approximately 100 additional grams of ethylone; (2) one bag containing caffeine; (3) multiple empty Ziploc bags and capsules; and (4) $348 in United States currency found inside a shoe in the bedroom closet.

At the end of the initial suppression hearing, Joseph asserted that he was moving to suppress the items collected during both the First and Second Searches. The Court orally denied Joseph's Motion as to the items collected during the First Search, but reserved ruling as to the

4

Second Search, and invited the parties so submit Supplemental Memoranda of Law in advance of the second suppression hearing.

During the second suppression hearing, Joseph moved to reopen the hearing on the Motion as to the First Search, which the Court granted. Joseph then recalled Detective Barney to the stand and cross-examined him on a report he prepared on June 22, 2015 about Joseph's arrest. In the report, Detective Barney wrote the following:

> Detective Suarez entered the house and while walking down the hallway toward the bedroom that Murray had pointed out as Joseph's bedroom, observed the door open by a black male. Detectives immediately were able to identify the black male that opened the bedroom as Joseph. Once we saw Joseph, he immediately attempted to close the bedroom on us, but we were able to stop him and enter the bedroom.

Def. Ex. 4. Joseph then argued that Detective Barney's report and Detective Suarez's testimony contained material inconsistencies, because Detective Suarez testified that he saw Joseph in the hallway while Detective Suarez was still in the doorway of the home. Joseph further argued that if Detective Barney's report, and not Detective Suarez's testimony, accurately depicts Detective Suarez's and Joseph's actions immediately prior to the First Search, then there were no exigent circumstances when law enforcement entered Joseph's bedroom. Joseph called no other witnesses at either suppression hearing.

## II.   THE FIRST SEARCH DID NOT VIOLATE THE FOURTH AMENDMENT

### A) Detective Suarez's Testimony

The Court rejects Joseph's arguments regarding Detective Suarez's testimony and finds that Detective Suarez testified credibly and accurately as to the events that transpired before, during, and after Joseph's arrest. First, the Court notes that Detective Barney's report was completed seventeen days after Joseph's arrest and is an amalgam of information based on his own observations and information from other law enforcement personnel. *See* Def. Ex. 4. As a

5

result, the Court will not reject Detective Suarez's testimony based solely on conflicting information in Detective Barney's report.

Second, Detective Barney himself testified at the hearing, and nothing he said is inconsistent with Detective Suarez's testimony. Joseph identifies Detective Barney's statement that he first spotted Joseph when Joseph tried to close his bedroom door as inconsistent with Detective Suarez's statement that he first spotted Joseph in the hallway. *See* Oct. 15 Tr. at 64:12–65:3. These statements, however, are not inconsistent because when Detective Suarez spotted Joseph in the hallway, Detective Barney was behind Detective Suarez and busy speaking with the owner of the home, Murray. *Id.* at 50:11–17. For these reasons, the Court credits Detective Suarez's testimony and finds that Detective Suarez spotted Joseph in the hallway, followed Joseph when Joseph fled to his bedroom, put his foot in the bedroom door to keep Joseph from closing it, and entered the bedroom.

**B) Exigent Circumstances Justified the Warrantless Entry**

Joseph argues that the items seized by police during the First Search should be suppressed because there were no exigent circumstances that justified law enforcement's warrantless entry into his bedroom. A "basic principle of Fourth Amendment law [is] that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 585–86 (1980). Accordingly, "[t]he Fourth Amendment generally prohibits the warrantless entry of a person's home, whether to make an arrest or to search for specific objects." *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990).

One exception to the warrant requirement, however, is when there is a warrantless search or seizure in a home "where both probable cause and exigent circumstances exist." *United States v. Hall*, 500 Fed. Appx. 819, 820 (11th Cir. 2012). For this exception to apply, " 'the exigencies

of the situation' [must] make the needs of law enforcement so compelling that [a] warrantless search [or seizure] is objectively reasonable under the Fourth Amendment." *Kentucky v. King*, 131 S. Ct. 1849, 1856 (2011) (quoting *Mincey v. Arizona*, 437 U.S. 385, 394 (1978)). "The exigent circumstances exception encompasses situations such as hot pursuit of a suspect, risk of removal or destruction of evidence, and danger to the arresting officers or the public." *United States v. Edmondson*, 791 F.2d 1512, 1515 (11th Cir. 1986). "Factors which indicate exigent circumstances include: (1) the gravity or violent nature of the offense with which the suspect is to be charged; (2) a reasonable belief that the suspect is armed; (3) probable cause to believe that the suspect committed the crime; (4) strong reason to believe that the suspect is in the premises being entered; [and] (5) a likelihood that delay could cause the escape of the suspect or the destruction of essential evidence, or jeopardize the safety of officers of the public." *United States v. Standridge*, 810 F.2d 1034, 1037 (11th Cir. 1987). Law enforcement may not manufacture such exigencies, but they do not do so provided that they "do not gain entry to premises by means of an actual or threatened violation of the Fourth Amendment." *King*, 131 S. Ct. at 1862.

Here, both probable cause and exigent circumstances justified the First Search. At the time law enforcement arrived at the house, police had probable cause to arrest Joseph for homicide and armed robbery based upon the surviving victim's and co-defendant's identification of Joseph as the shooter. After knocking on the door, the police confirmed that Joseph was in the house and obtained consent from the home's owner to enter the home. Exigent circumstances arose when Detective Suarez spotted Joseph and Joseph fled back into his bedroom. At that point, police were certain that Joseph was in the house. Based on the violent nature of the suspected offenses, police had every reason to believe that Joseph both possessed and was going

to retrieve a firearm. For their own safety and for the safety of the public, the police entered Joseph's bedroom, arrested Joseph, and conducted a protective sweep. In so doing, the police acted reasonably and were justified in seizing those items that were in plain view without a warrant.

This is still the case under the facts in Detective Barney's report—i.e. that Detective Suarez was in the hallway, and Joseph merely opened his door and then tried to close it upon seeing Detective Suarez. First, it is undisputed that Murray was the owner of the home and that he was renting a room to Joseph. Therefore, once law enforcement had Murray's consent to enter the home, Detective Suarez had the right to be inside the home.[2] Second, once Joseph opened the door, spotted Detective Suarez, and attempted to close the door, his actions were functionally equivalent to fleeing down the hall and into the bedroom. The police would still have the same grave concerns for their own safety and the safety of the public, especially given that the firearm used in the underlying homicide and armed robbery was never recovered. For these reasons, there was no Fourth Amendment violation and the evidence seized during the First Search is admissible.

### III.  THE SECOND SEARCH

**A) The Issue of Consent as to the Second Search Is Properly Before the Court**

As a preliminary matter, the Government contends that Joseph did not raise the issue of consent as to the Second Search until the suppression hearing, and that therefore, the Court should not consider it. It is true that if a defendant fails to present a claim in his motion to

---

[2]  The police may have been justified in entering Joseph's bedroom based on Murray's consent if, at the time the police entered the bedroom, they reasonably believed that Murray owned the house and had common authority over the bedroom. *See, e.g., Illinois v. Rodriguez*, 497 U.S. 177, 179 (1990) (holding that "a warrantless entry is valid when based upon the consent of a third party whom the police, at the time of the entry, reasonably believe to possess common authority over the premises, but who in fact does not do so").

suppress that is sufficiently "definite, specific, detailed, and nonconjectural" as to a given issue, "the opportunity is waived unless the district court grants relief for good cause shown." *United States v. Richardson*, 764 F.2d 1514, 1527 (11th Cir. 1985) (citing Fed. R. Crim. P. 12(b)(3), 12(f)). Here, however, Joseph specifically alleged with respect to the Second Search that the police "searched the house and bedroom without valid consent." As such, while Joseph probably could have been more specific regarding the underlying facts supporting his claim for suppression, the Government cannot claim that it was not on notice that Joseph's consent to the Second Search was an issue triable at the suppression hearing. Therefore, the issue of consent as to the Second Search is properly before the Court.

### B) The Government Adduced Sufficient Evidence Demonstrating that Joseph Voluntarily Consented to the Second Search

Another well-recognized exception to the warrant requirement is a search conducted pursuant to valid consent. *See, e.g., Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973). When the Government seeks to rely on consent to justify a warrantless search, the burden is on the Government to prove "that the consent was, in fact, freely and voluntarily given." *Id.* Whether consent to search was freely and voluntarily given "is a question of fact to be determined from the totality of all the circumstances." *Id.* at 227. "[I]t is only by analyzing all the circumstances of an individual consent that it can be ascertained whether it was in fact voluntary or coerced." *Id.* at 233.

In this case, Joseph argues that the Government failed to adduce sufficient evidence during the initial suppression hearing demonstrating that Joseph voluntarily consented to the Second Search. The Court disagrees. The evidence offered as to this issue consisted of the signed "Consent to Search" form, Detective Suarez's testimony that Joseph's consent was obtained "[a]n hour or two hours" after Joseph's arrest, and Detective Suarez's testimony that

9

neither Detective Suarez nor Detective Garcia threatened Joseph before he filled out the forms. None of this evidence is controverted in any way. Under these circumstances, the Court finds that the Government met its burden to establish the voluntariness of Joseph's consent to the Second Search.

Joseph argues that the existence of the signed, written consent form alone does not establish that his consent was given voluntarily. In support of that position, Joseph cites *United States v. Tovar-Rico*, 61 F.3d 1529 (11th Cir. 1995), a case in which the court found that the consent to search an apartment was not voluntary, despite the existence of a signed, written consent-to-search form. In that case, however, law enforcement asked the defendant for consent to search her apartment mere seconds after agents stormed into the defendant's apartment and conducted a protective sweep in every room under the auspices of exigent circumstances.[3] *See id.* at 1535–36. The Eleventh Circuit affirmed a district court finding that the consent was involuntary because the defendant "had already observed officers explore every room in the apartment and could not reasonably have known that she could still refuse a search." *Id.* at 1536. In this case, however, at least an hour had passed between Joseph's arrest and his signed, written consent. As such, unlike in *Tovar-Rico*, the shock of the initial encounter with police had subsided significantly, and the uncontroverted evidence demonstrates that Joseph was not threatened prior to signing the "Consent to Search" form. This case is very different from *Tovar-Rico*.

Finally, the Court is cognizant of the fact that the record evidence of voluntariness in this case is less than the evidence presented in *United States v. Walton*, 323 F. App'x 837 (11th Cir.

---

[3] The court also held that exigent circumstances did *not* exist justifying the warrantless entry into defendant's apartment because "the agents did not reasonably believe that they were confronted with an emergency in which the delay necessary to obtain a warrant under the circumstances threatened the destruction of evidence." *Tovar-Rico*, 61 F.3d at 1535.

2009) and *United States v. Vera*, 701 F.2d 1349 (11th Cir. 1983), which are cases that the Government relies upon in its briefing. The Court, however, finds that the evidence that was presented was sufficient to demonstrate that Joseph voluntarily consented to the Second Search, especially given that Joseph adduced *no* evidence tending to show that his consent was coerced. Therefore, the Court finds that the Second Search was conducted pursuant to voluntary consent, and the evidence seized during the Second Search is admissible.

## IV.   CONCLUSION

For the foregoing reasons, it is

**ADJUDGED** that Defendant's Motion to Suppress is **DENIED**.

DONE AND ORDERED in Open Court on October 20, 2015 in Miami, Florida and signed in Chambers in Miami, Florida, this 16th day of November 2015.

_____
FEDERICO A. MORENO
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record